1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF KENTUCKY
2              LOUISVILLE DIVISION

3
UNITED STATES OF AMERICA,      )     Case No. 3:24-CR-112-DJH-2
4                              )
          Plaintiff,           )
5                              )
v.                             )
6                              )
BRUCE A. MILLS,                )
7                              )     October 30, 2024
          Defendant.          )     Louisville, Kentucky
8

9                        *  *  *  *  *

10        TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING
              BEFORE HONORABLE REGINA S. EDWARDS
11              UNITED STATES MAGISTRATE JUDGE

12                       *  *  *  *  *

13   APPEARANCES:

14   For United States:      Mac Shannon
                             US Attorney Office
15                           717 W Broadway
                             Louisville, KY  40202
16
     For Defendant:          Rob Eggert
17                           600 W Main St, Ste 100
                             Louisville, KY  40202
18

19      Transcriber:             Rebecca S. Boyd, RMR, CRR
                                 Official Court Reporter
20                               208 U. S. Courthouse
                                 Louisville, KY 40202
21

22

23      Proceedings recorded by digital recording.  Transcript
     produced by computer from audio recording that the Court
24   provided to transcriber.

25

1    (Begin proceedings in open court at 1:05 p.m.)

2         DEPUTY CLERK:  3:24-CR-112, *United States of America*

3    *versus Bruce A. Mills*.  We're here for an arraignment and a

4    detention hearing.

5         THE COURT:  All right.  Appearances, please.

6         MR. SHANNON:  Good afternoon, Your Honor.  Mac Shannon

7    for the United States.

8         MR. EGGERT:  Good afternoon, Your Honor.  Rob Eggert

9    for Mr. Mills.  He's present.

10         THE COURT:  All right.  Well, let's proceed with

11    arraignment first.  Mr. Eggert, have you had ample opportunity

12    to talk with your client about the indictment?

13         MR. EGGERT:  Yes, Your Honor.

14         THE COURT:  And does -- is his identity contested or

15    acknowledged?

16         MR. EGGERT:  No.  We would waive a formal reading,

17    acknowledge identity, reserve the right to make motions at a

18    later date and deny forfeiture, Your Honor, and enter a plea of

19    not guilty.

20         THE COURT:  All right.  All noted for the record.

21    And, sir, your plea of not guilty is entered onto the record

22    today.

23      I'll remind the United States of its continuing obligations

24    regarding discovery in accordance with Brady v. Miller and its

25    progeny.  The United States is reminded to provide discovery.

1  Failure to do so in a timely manner may result in sanctions,

2  including dismissal of charges or other sanctions as

3  appropriate, and an order will be entered onto the Court to that

4  effect as well.

5      All right.  Turning now to detention.  It is the United

6  States' motion for detention in this case?

7          MR. SHANNON:  Yes, Your Honor.  It is the United

8  States' motion for detention.  This is a presumption case based

9  on the drug quantity as well as the firearms.

10          THE COURT:  All right.  Given that it is a

11  presumption, Mr. Eggert, I'll allow you to go forward first.

12          MR. EGGERT:  Thank you.  Your Honor, to begin, we'd

13  ask to call probation.

14          THE COURT:  All right.

15      (DAVID THROCKMORTON, called by the Defendant, was sworn.)

16                      DIRECT EXAMINATION

17  BY MR. EGGERT:

18  Q.  Could you state your name for the record?

19  A.  Yes, sir.  David Throckmorton.

20  Q.  And did you do the bond report or the pretrial services

21  report in this case?

22  A.  No, sir.

23  Q.  Are you familiar with it?

24  A.  Yes, sir.

25  Q.  All right.  I'd like to ask you first:  They -- pretrial --

1  or you-all stated there were no -- no factors indicating a risk

2  of nonappearance.  Would you agree?

3  A.  Yes, sir.  May I reference it, Your Honor?

4  Q.  Yes, please.

5  A.  Yes, sir.

6  Q.  All right.  Now, let's go assessment of danger.  One:

7  Violent behavior history.  This is -- that's what -- that's what

8  probation noted, correct?

9  A.  Yes, sir.

10  Q.  All right.  Now, is that based upon the one charge of

11  attempted strangulation, assault fourth?  Is that what that's

12  based on?

13  A.  That would be my interpretation.  Yes, sir.

14  Q.  All right.  Well, do you know if that's still a felony?

15  A.  Excuse me.  I don't understand the question.

16  Q.  Well, is it -- it's charged as a felony.  Do you know if

17  it's even first -- even a felony, at this point?

18  A.  I believe it's been charged as a felony.  I am not -- I

19  don't have anything more up-to-date than what's on the report.

20  Q.  Well, do you see the note on the report?  It was already

21  amended down.  So it's now -- it's not a felony at all, it's a

22  misdemeanor.  Is that correct?

23  A.  That's what it says on the report.  Yes, sir.

24  Q.  Well, that's what the report says, right?

25  A.  Yeah.  That's the information I have.

1  Q.  Right.  And is there a date?  Is there a trial date?  I

2  mean, what is going on with the case?

3  A.  Sir, I don't have any more information than what's on the

4  report.

5  Q.  All right.  And, at least according to the report, he's been

6  found -- he hasn't been found guilty of anything, correct?

7  A.  Not that I'm aware of, sir.

8  Q.  Right, and how long has this case been going on that is the

9  basis for saying that he's a violent history?  Has it been going

10  on about 10 months?

11  A.  Since, it looks like, February 8, 2024.

12  Q.  All right.  So -- and there's been no adjudication, no

13  guilty plea, no finding of guilt, nothing, correct?

14  A.  Not that I'm aware of, sir.

15  Q.  And, obviously, pretrial didn't -- you-all didn't contact

16  or -- this woman that -- this -- the person who is the

17  prosecuting witness, correct?

18  A.  Not that I'm aware of.

19  Q.  All right.  And that, this case that's now been amended to a

20  misdemeanor, is the basis for saying that he has a violent

21  criminal history on a report; is that right?

22  A.  That would be my interpretation based upon what's contained

23  in the report.  Yes, sir.

24  Q.  All right.  Let's keep going for these reasons that pretrial

25  couldn't recommend release.  It says, "Criminal association."

1    What are you-all talking about?

2    A.   From what's contained in the report, I believe there's a

3    co-defendant in this case.  That would be my interpretation of

4    the recommendation.

5    Q.   There is a co-defendant, so you call it criminal

6    association?

7    A.   That's what was, I believe, referenced in the report, so --

8    Q.   Would that mean any case that there's a co-defendant, we're

9    going to have something here?  Assessment of danger, criminal

10   association because there is a co-defendant?

11   A.   Potentially.

12   Q.   Potentially?  Okay.  So that fact is against you in just

13   that there is a co-defendant; is that correct?

14   A.   It's a case-by-case basis, sir, but --

15   Q.   Yeah, but there's no --

16   A.   But it's very possible.  Yes, sir.

17   Q.   You know nothing about any potential criminal association

18   except there's a co-defendant; is that fair to say?

19   A.   Yes, sir.

20   Q.   Well, in terms of association, is the co-defendant and the

21   defendant -- are they related?

22   A.   I don't have any information related to that, sir.

23   Q.   Are you aware it's his brother?

24   A.   I am not.

25   Q.   Okay.  So he's got a co-defendant on a case that they call

1    criminal association.  Then it says, and this would make a Court

2    pause, number four, safety concerns for the community or

3    specific individual.  What individual?

4    A.  Sir, typ -- and, typically, that would be in reference to

5    the nature of the offense being one of danger or involving

6    dangerous drugs.

7    Q.  No, it says, "Safety concerns for the community or a

8    specific individual."  So I'll ask you, now that that's on the

9    report, what specific individual?

10   A.  Sir, the only thing I believe that could potentially

11   reference, and, again, I did not write the report, would be the

12   fact that there is a no-contact order and a victim in that

13   pending case that you referenced.

14   Q.  Of course you don't have any evidence he's broken a

15   no-contact order, correct?

16   A.  I do not.

17   Q.  And you-all haven't talked to the -- talked to the

18   prosecuting witness, even assuming you could get ahold of her,

19   correct?

20   A.  I have not, and I'm not aware of any contact.

21   Q.  So we have -- there's no specific evidence that there is a

22   concern or safety concern for a specific person at all, correct?

23   A.  I could -- I couldn't answer that question, sir.  I don't

24   know.

25   Q.  Well, it's right down here.  You swipe to one fact, a

1    specific fact, a specific individual who's supposedly in danger.

2    A.  Outside of the nature of the offense and what I've already

3    explained would be my reference back to being that pending case

4    having a potential victim and a no-contact order.

5    Q.  In other words, the answer is none?  You-all have no

6    specific evidence except the charge and a no-contact order,

7    correct?

8    A.  I answered the question.  I'm not aware of any other

9    specific evidence, no.

10   Q.  Okay.  Well, these recommendations are important.  So let me

11   go to the next one, criminal history.  Is the defendant a felon?

12   A.  Not that I'm aware of, sir.

13   Q.  And has the defendant ever -- he's not a felon, so he

14   wouldn't have been in prison.  How old is the defendant?

15   A.  Sir, he was born in -- May 29th, 1991.  So I'd say roughly

16   34.

17   Q.  Thirty-some years old?

18   A.  Yeah.  Thirty-three.

19   Q.  All right.  So he's 30-some years old.  He's not a convicted

20   felon.  Let me ask you this:  In the course of his life, do you

21   know how many days he's ever spent in jail?

22   A.  I don't have that information, sir.

23   Q.  You don't?  Well, does it appear that he spent any time in

24   jail?

25   A.  Yes, sir.  I believe he's detained currently.  So there --

1  Q.  Well, he is detained.  I'm talking about before.  I'm

2  talking about his prior criminal history.

3  A.  I'm not sure --

4  Q.  If you-all detain him, then you can't say, "Well, he's had

5  jail time before," right?  So I'm asking you before this case,

6  how many days had he spent in jail?

7  A.  I could reference the criminal history contained in the

8  report if you'd like me to --

9  Q.  Would you dispute if I said one day of his entire life he's

10  ever spent in jail?

11  A.  Without looking at it, sir, I don't know, but if that's,

12  what you're telling me, I believe you.

13  Q.  Okay.  Well, you can check.  You can dispute me if you'd

14  like.

15  A.  Would you like me to check?

16  Q.  I'm saying if you want to dispute me.  Would you dispute me

17  on one day in jail?

18  A.  I don't have any reason to dispute you if that's what you're

19  representing for your client.

20  Q.  So he is not a felon.  Obviously, he's never been to prison.

21  Spent one day in jail in his life.  Now, in terms of community

22  ties, does he live here in Louisville?

23  A.  Yes, sir; I believe so.

24  Q.  Does he have his own place?

25  A.  From what's in the report, it looks like he lives with his

1  significant other.

2  Q.  All right.  Does he have his own business?

3  A.  That is what's also referenced in the report, I believe a

4  lawn care business.

5  Q.  So he has a lawn -- and you say he owns a lawn care

6  business?

7  A.  That's what the defendant reported.  Yes, sir.

8  Q.  All right.  And he graduated from high school?

9  A.  That is also what the defendant reported.  Yes, sir.

10 Q.  And how many children does he have here?

11 A.  I believe two.

12 Q.  Two minor children; is that correct?

13 A.  Yes, sir.

14 Q.  All right.  So I guess I'd ask you here, in terms of

15 these -- assessment of danger, the violent history is --

16 behavior history is based on this now misdemeanor case of which

17 he's never been convicted, correct?

18 A.  Yes, sir.  From what we've discussed earlier, I think that

19 was the --

20 Q.  The criminal association is because there is a co-defendant;

21 is that right?

22 A.  I believe so, sir.

23 Q.  Yeah.  There's no -- you have no specific individual who is

24 in danger of anything.  There's a no-contact order, but you have

25 no evidence he ever violated it, correct?

1    A.  I do not.

2    Q.  And a criminal history, he's not a felon, he's 32 years old,

3    and he spent a day in jail.  I mean, those are the actual true

4    facts here, correct?

5    A.  I believe he's, yeah, 32, 33, and if that -- again, if

6    that's what you're referencing, he spent a day in jail, then

7    yes, sir.

8           MR. EGGERT:  If I could just have a moment.  I don't

9    have any further questions.

10                        CROSS-EXAMINATION

11   BY MR. SHANNON:

12   Q.  Sir, in the report, United States Probation does not make

13   any findings as regarding the presumption in this case; is that

14   fair to say?

15   A.  Yes, sir.

16   Q.  And that's noted in the report?

17   A.  Yes, sir.

18   Q.  As well as none of the facts of the pending case are taken

19   into consideration per this report?

20   A.  Yes, sir.

21   Q.  All right.  And you are aware that -- as we've gone over,

22   that the defendant was on bond during the commission of these

23   offenses?

24   A.  Yes, sir.

25   Q.  And as well as you're aware of bond conditions that are

1    often that defendants do not possess firearms.  Is that a bond

2    condition established routinely through the state?

3    A.  I would say yes, although I don't specifically know in this

4    case whether or not that was established.

5    Q.  Would you have any reason to dispute the defendant was

6    ordered, pursuant to his bond, not to possess any firearms?

7    A.  I don't have any reason to dispute that, but, again, I don't

8    know 100 percent.

9    Q.  So if he possessed firearms after this case in February 8th

10   of 2024, and he was ordered not to have possession of firearms,

11   would that be a violation of his bond?

12   A.  Yes, sir.

13   Q.  And would that be a condition that probation will look at in

14   recommending for or against detention?

15   A.  If he violated a condition of his bond?

16   Q.  Yes.

17   A.  That would be a consideration for detention.

18   Q.  Okay.  Now, you have stated that there is a no-contact --

19   you're aware of a no-contact order in that case?

20   A.  Yes.

21   Q.  And that case is still pending?

22   A.  Yes, sir.

23   Q.  And are you aware that the co-defendant is a convicted

24   felon?

25   A.  I am not specifically, but I believe that was a

1    consideration, again, as we talked about.

2    Q.  Actually -- and based on live cross-examination and things

3    that's still gone forward, is it still the position of United

4    States Probation that there are no conditions that will mitigate

5    against the defendant posing a risk of danger to the community

6    at this time?

7    A.  Yes, sir.

8           MR. SHANNON:  Nothing further, Your Honor.

9           THE COURT:  All right.

10          MR. EGGERT:  Judge, I do, if I could.

11                      REDIRECT EXAMINATION

12   BY MR. EGGERT:

13   Q.  First of all, he kept saying, "If there's, if there's, if

14   there's an order as to bail."  Do you have any order -- bond

15   order saying he can't have a gun?

16   A.  I do not have a copy of the conditions.

17   Q.  I don't mean a copy.  Do you have any evidence or

18   information that he couldn't have a firearm?

19   A.  No, sir.

20   Q.  All right.  And, in fact, he's a nonfelon, correct?  So --

21   right?

22   A.  Yes, sir.

23   Q.  All right.  So you don't have any information that there was

24   an order like that at all, correct?  Zero.

25   A.  No, sir.

1   Q.  All right.  So then they said that his brother, Frank Brown,

2   is a felon.  Well, I've got to ask you:  You're not saying he's

3   not supposed to associate with his brother, are you?

4   A.  I would say --

5   Q.  I mean, before this happened, is -- should he not associate

6   with his brother?

7   A.  Typically, if a person is engaged in criminal activity, that

8   would be an association we would prohibit or suggest be

9   prohibited.

10  Q.  Well, let me follow up on that.  Many families have

11  convicted felons in their families.  Are you saying the other

12  members should not associate with that person?

13          MR. SHANNON:  Your Honor, I'm going to object at this

14  point.  This is asked and answered.  Probation has made it clear

15  it's the criminal contact that makes the association relevant to

16  their consideration.  It's not the fact that they're simply

17  relatives and being a criminal convicted felon or nonfelon.

18  It's the association based on the criminal activity is what the

19  officer has stated, and he stated that repeatedly, at this

20  point.

21          MR. EGGERT:  Actually the prosecutor asked, "Are you

22  aware his brother, Frank Brown, is a convicted felon?"  And so I

23  can't see how the status of his brother as a convicted felon

24  somehow are grounds to say he's dangerous or should be confined,

25  and that was the point of my question.  I can move on, Judge,

1    but that was the -- that was the --

2              THE COURT:  Okay.

3              MR. EGGERT:  -- point of my question.

4              THE COURT:  If you'll -- if you'll move on, I'll

5    sustain --

6              MR. EGGERT:  Thank you.

7              THE COURT:  -- the objection.

8              MR. EGGERT:  Now, I'd like to show you this to Mr.

9    Shannon.  If I could approach the witness, Your Honor.

10             THE COURT:  Yes.

11   BY MR. EGGERT:

12   Q.  Okay.  I'm going to hand you CourtNet on the case you

13   referred to, the strangulation case.  It's marked as Defense

14   Exhibit Number 1.  Now -- and could you just give the title of

15   that case?

16   A.  The case number?

17   Q.  Not the case number but who's it is.  The defendant, Mr.

18   Mills?

19   A.  Yes.

20   Q.  All right.  Now, if I could refer you to something here.  On

21   2-8-24, was there a bond decision?

22   A.  Yes, sir.

23   Q.  And what was the bond?

24   A.  Agreed bond, $1,000, then HIP if posted.  Defendant may post

25   today.

1 Q.  And if you have a chance, does it appear that, at some

2 point, that bond was released?  While you're looking for that,

3 I'll ask this:  Is there anything there that says no firearms?

4 A.  I don't believe so.

5 Q.  Is the answer to that no?

6 A.  No, sir.  Not from what I've seen in the 2-18 arraignment

7 super memo -- or 2-8.  Excuse me.

8          MR. EGGERT:  All right.  Thank you.  Nothing further.

9          THE COURT:  All right.

10          MR. SHANNON:  Nothing further, Your Honor.

11          THE COURT:  Thank you.  You can step down.

12     Any other witnesses, Mr. Eggert?

13          MR. EGGERT:  No, Judge, but I would like to make an

14 argument.

15          THE COURT:  All right.  First, are there any witnesses

16 from the United States?

17          MR. SHANNON:  No.  We'll have evidence, Your Honor.

18          THE COURT:  Excuse me?

19          MR. SHANNON:  I do have evidence.

20          THE COURT:  All right.

21          MR. SHANNON:  And if I could have (indiscernible).

22 Your Honor, is the ELMO -- don't see the light.  What I'll do

23 is -- Your Honor, as part of the dangerousness and the firearms

24 that were associated with Mr. Mills on his arrest and the charge

25 and relating to the 924(c), United States would have evidence

1    related to those firearms specifically.  That on May 9th of

2    2024, he was in possession of three separate firearms and

3    firearm, basically, enhancements.

4        What I would show to the Court is Exhibit 1, 2, and 3 and 4,

5    which relate to a firearm at the time of the search warrant, was

6    in the vehicle in which Mr. Mills was operating and seemed to

7    operate outside of where he was distributing narcotics.  Inside

8    the vehicle is a nine-millimeter firearm with additional, inside

9    the door, extended magazines for nine-millimeter weapons.

10       Also at the time of the search at the same location, at the

11   back of the property was a shed in which Mr. Mills had the keys

12   to and had been seen on multiple surveillance going in and out

13   of in which he was storing methamphetamine, scales, other drug

14   paraphernalia, two additional firearms:  A purple SCC firearm

15   loaded with a clip and an additional firearm, a .40-caliber

16   firearm, fully loaded in a gun case.  The purple SCC will be

17   Exhibits 5, 6, and 7, and the other firearm are Exhibits 8 and

18   9.

19       Exhibits 10 and 11 are firearm accessories and which are

20   modifications that allow a pistol to be held as a rifle with an

21   extended clip that is -- has ammunition within it.  If I may

22   approach.

23           THE COURT:  Yes.  You said 11 exhibits total?

24           MR. SHANNON:  Exhibits 1 through 11.  Yes, Your Honor.

25   And I apologize for the ELMO situation.

1          DEPUTY CLERK:  I was going to try something.  I didn't
2     want to interrupt you in the middle, but I think I --
3          MR. SHANNON:  And I can go through again.
4          DEPUTY CLERK:  Is it working now?
5          THE COURT:  Yeah.
6          DEPUTY CLERK:  Or is it --
7          THE COURT:  The screen is on.
8          MR. SHANNON:  All right.
9          DEPUTY CLERK:  It appears to be, but --
10         MR. SHANNON:  And as relates to -- there is no doubt
11    that Mr. Mills was on bond on May 9th of 2024.  The charge which
12    he is facing is possession of firearms in furtherance of drug
13    trafficking activity.
14       Again, this goes to the dangerousness, and the point is it's
15    not just a simple single firearm, it's a firearm that he is
16    using while traveling and conducting narcotics as far as the
17    vehicle is concerned.
18       And, again, this close-up of where it's located in the seat
19    is the driver's side, Exhibit 3, that it is loaded.  In Exhibit
20    4, the driver's side door, additional extended magazines for
21    that weapon.
22       Inside the shed on the property where he is storing his
23    narcotics are not just one but, again, two additional firearms.
24    Again, all firearms in this case are fully loaded.
25       Lastly, the modifications -- this is Exhibit 8 is a

1    modification, essentially, where a handheld pistol would be

2    slotted into this to make it function as a rifle with an

3    extended clip.

4        The dangerousness, obviously, goes to the factors, and the

5    firearms being -- goes to the presumption.  Probation has not

6    considered the presumption in this case, and so the United

7    States is tendering these exhibits to, again, go to the

8    dangerousness.

9        As far as the bond situation, Your Honor, and I'll simply

10   just state as an officer of the Court, and I know it is not

11   considered in the bond report, there is a video of the bond

12   conditions being told to Mr. Mills, and Mr. Mills not to possess

13   a firearm.

14       United States has that, and we can supplement with that, and

15   I believe there is a later order that comes out that recognizes

16   that -- the firearm prohibition, but for the purposes of the

17   hearing today, the United States is not going to rely on that,

18   but we can supplement.  I don't want to catch Mr. Eggert out of

19   not being aware that they exist.

20           MR. EGGERT:  Well, because I don't see an order, and

21   that's how --

22           MR. SHANNON:  And --

23           MR. EGGERT:  -- the Court operates, obviously, is

24   through orders.

25           MR. SHANNON:  And my understanding is we have the

1    order, and we have the video of the hearing.  So I understand,

2    and it is not my intent to put something forward that Mr. Eggert

3    has not had a chance to see, but --

4             THE COURT:  Are you able to produce it and provide it

5    to us?

6             MR. SHANNON:  It's in disco -- it will be in

7    discovery.  We have it.  So --

8             THE COURT:  So --

9             MR. SHANNON:  But for the purposes of going forward,

10   the United States is simply relying on the fact --

11            THE COURT:  Well, hold on.

12            MR. SHANNON:  -- that he was on --

13            THE COURT:  Hold on.

14            MR. SHANNON:  I apologize.

15            THE COURT:  So are you saying that today, you're

16   providing it in the context of discovery, but are you proffering

17   it as part of the hearing today with respect to detention

18   considerations?

19            MR. SHANNON:  I think because the factor was that he

20   was on bond is sufficient for the United States' argument here

21   today.  That he had that case and was on bond.  I think it is

22   splitting hairs to say whether or not a person could possess a

23   firearm.  And, again, because we are tailoring it with the

24   presumption that it is in furtherance of a drug trafficking

25   activity, there was no legal way for any of those firearms to be

1 possessed.

2     I think that cuts against Mr. Eggert's argument, and we're

3 prepared to do that. I don't have the documents here today,

4 because I didn't think that that was going to be an issue, but I

5 don't want to delay the proceedings.

6     So I am simply acknowledging that and stating that that

7 exists, but for the purposes of the hearing, the fact that he

8 was on bond while he has committed the crime that he's now in

9 federal court for, that is enough of a violation.

10     So with that, that would essentially -- United States would

11 move to adopt the pretrial services report, and that would be

12 the evidence for the United States, at this point.

13         THE COURT: All right. Turning to argument now.

14         MR. EGGERT: Thank you.

15         THE COURT: And, Mr. Eggert, go ahead.

16         MR. EGGERT: Thank you. Judge, present, his mother,

17 Chachika Coleman, also his sister, Taiaka Coleman, and his

18 partner, Amber Miller, they're all here today, obviously,

19 supporting -- supporting him.

20     Judge, just to start, I don't think there's any allegation

21 that he is a flight risk, so I won't spend any time on that.

22 They don't even claim that he is a flight risk. All right.

23     Now, Judge, let's -- let's go to danger. They said -- this

24 search warrant they're talking about and these pictures and

25 these guns, I assume they have something like this, because they

1   charged a 924(c), but that just gives them the benefit of a

2   presumption.  It doesn't give them the benefit of automatic

3   detention.  Particularly so, Judge, when my client was there May

4   9th.

5       And you'll note, Judge, one thing they don't have is a date

6   of arrest of May 9th.  They didn't arrest him.  They sent him on

7   his way.  And the real reason, Judge, is that they're trying to

8   detain him, and that they arrested him, at this point, is that

9   he did not cooperate with them.  So they really out to put that

10   as part of their -- the statutory reasons for detention.

11       He's there May 9th.  We're here months later.  They finally

12   arrest him, and that's because he didn't cooperate.  In fact,

13   he's supposedly dangerous.  He's supposedly a threat to the

14   community.  He walks out of there May 9th.  They do absolutely

15   nothing to him.

16       Now, Judge, regarding -- I have this, and I'm going to

17   introduce it, the thing, but this -- this strangulation charge,

18   as I say, it goes back all the way -- it goes back to February,

19   and nothing's ever been done with it except it's been amended

20   down to a misdemeanor without -- without a plea.  All right?

21       So, I mean, I'm not a betting man, but if I was, Judge, I

22   would shake your hand and say he's never going to be convicted

23   of anything on this.  It's been passed along ten months.

24   Apparently, the prosecuting witness has never shown up.  One of

25   the continuances is so they can go and try to speak with her.

1    I'm not representing him on that, but the defendant advised

2  there's video evidence which contradicted the story, and he's

3  been convicted of nothing.  Of absolutely nothing, at this

4  point, zero.

5    Regarding, Judge -- in addition to what we have here, if

6  he's released, the pretrial report -- he would continue to live

7  where he does live.  His -- his partner Amber Miller is here.

8  She actually works as a lab assistant for U of L, has absolutely

9  zilch record, is willing to be a third-party custodian, and --

10  and she is present.  If you could just stand up.  And she has no

11  record at all, none, zero.  And he's been in a relationship with

12  her for years, and they have these two minor children, ages one

13  and three.  So, you know -- Bruce and Carter, and she is the mom

14  of both of them.

15    In addition, the pretrial report shows that he owns his own

16  business.  He's lived here all his life.  They couldn't

17  contradict when I said one day in jail.  I'm not -- I'm not

18  disputing that DUI isn't a serious offense, but it's a

19  misdemeanor offense.  He spent one day in jail, period.  Zero.

20  Obviously, no felonies.  Never been to prison.

21    In addition, Judge, after what occurred May 9th, he sticks

22  around.  Hardly a danger.  He sticks around, has been in the

23  community for months without any incident -- any incident at

24  all.

25    And I know the guns are concerning, but on a 924(c), there's

1    always going to be guns.  The question is, you know, are

2    police -- you know, police took pictures of the guns, and I

3    presume they seized them.  I presume they didn't give them back

4    to him, but -- but they let him walk -- walk off.  And here he

5    is still here, still with his own business, with his family,

6    with his partner and taking care of the children.

7        So the question the Court has to ask, given this here

8    history, at age 32, given the fact that, really, when you look

9    at this pretrial report, there's nothing to show that he's a

10   danger to any specific individual.  The criminal association,

11   Frank Brown's his brother.  I don't know what he's suppose to do

12   about that.

13       Violent criminal behavior, they haven't shown that at all.

14   The criminal history one could say is extremely minor.  Then

15   when you couple that, when he's lived here, he didn't flee when

16   they -- when they got him, that he's free here, is he works.

17   Judge, we think there are certainly conditions that would assure

18   the safety of the community.

19       And I would presume that that's what authorities thought,

20   because if law enforcement thought he was a danger, they would

21   have put the cuffs on him right then.

22       So we would ask, Judge, that -- that he be released on

23   strict conditions, that he reside where he lives.  That if you

24   need a third-party custodian, Amber Miller, who works at U of L,

25   would be happy to be a third-party custodian.  He would continue

1    to live where he lives.  He'd continue to support his family,

2    which is very important.  He'd continue to take care of his

3    children, and he'd fight this case, and, obviously, he is

4    presumed innocent.

5        And I know they talk about the presumption, and I get that.

6    There is a presumption, but we think, in this case, it's

7    overcome by all the other things.  And I'd also point out that

8    incarceration, Judge, it just completely undermines the

9    presumption of innocence.

10       I know this is legal -- a legal -- they can say legally,

11   it's just -- doesn't show your -- it's just a presumption, but

12   to tell somebody you're really presumed innocent, but you're

13   sitting in Grayson County Jail, and you're separated from your

14   two kids, three and one, and you haven't been convicted and

15   separated from your partner, and you've never been convicted of

16   a felony before, and it's very difficult.

17       So we would ask, Judge, that the Court release him under the

18   conditions proposed.  We would not be asking for any releases,

19   and if I needed to see him, I would just go visit him.

20       And finally about these guns, I know they're concerning,

21   Judge, about, well, it's got features of this or that.  There's

22   no evidence that he ever did any of those features.  There's

23   also no evidence, Judge, that -- the guns are there.  That's

24   about it.  And there's no evidence, I guess, beyond the mere

25   fact that the 924(c) was all that was needed to detain and

1    without bail, that -- then the Congress could have written a law

2    like that, and they didn't, so I'd ask for his release.  Thank

3    you.

4              THE COURT:  All right.  Thank you.  Argument from the

5    United States.

6              MR. SHANNON:  Yes, Your Honor.  Mr. Mills should be

7    detained in this case as there are no reasonable conditions that

8    the Court can impose that he would not be a danger to the

9    community.  United States has already noted and adopted United

10   States Probation's report.

11       There are two presumptions in play in this case.  The number

12   one is the quantity of drugs and the type of drugs for which he

13   is facing more than a ten-year sentence.

14       This is a very concerning matter, particularly given that

15   it's methamphetamine and Fentanyl involved in this case.  There

16   is a continued danger to the community based on those drugs

17   alone and the whole point of the presumption.  And it is not a

18   punitive matter, it is a matter to ensure the safety and does

19   not touch upon whether he's presumed innocent at this point or

20   not.

21       Two is the firearms, and a 924 carries a presumption.  And

22   in this case, there are many cases, as the Court is aware, that

23   there is a single gun, a single firearm that is the basis for

24   that.  In this case, we have three separate firearms, two

25   different locations, being transported.  The amount of

1    ammunition and modifications is taking that above and beyond the

2    normal, typical cases.

3        As far as the presumption, both of those presumptions,

4    whether overcome or not, at this time, they still remain a

5    factor for the Court to -- in its consideration to determine

6    whether or not there are any conditions.

7        I would pose to the Court that there are the individual and

8    the violent behavior related to not the wife, not the

9    girlfriend, not the person who he's had the relationship.  It is

10   very troubling that that association is even going on and is

11   related to strangulation and domestic violence situation.

12       Two:  We have the type and the association -- it is the

13   criminal association with a convicted felon, Mr. Brown, as the

14   Court is aware.  His case had continued to be investigated as

15   recently as within the last week, and an additional search

16   warrant was executed on his residence.  Firearm, additional

17   narcotics were retrieved.

18       Troubling in its entirety is just the family association.

19   The property in which the search warrant is executed was the

20   property of his mother.  We are aware that individuals,

21   associated family members of Mr. Brown, took steps to hide and

22   seclude evidence based on pole cam video watching these

23   individuals take these actions.  So to sit and turn around and

24   proffer family members is highly troubling in this case given

25   the conduct that has gone forward.

1    But with the dangerous associations and being -- committing

2   these crimes on property belonging to other family members with

3   another family member and being indicted with that family

4   member, those are criminal associations that are very troubling

5   and, again, go to the dangerousness of this individual.

6    So we have specific concerns for the indicted person as well

7   as a number of cases, there are controlled buys.  Probation does

8   not consider the weight of the evidence, but those are

9   individuals.

10    There is a confidential informant.  That person is out in

11   the community and would be at risk, particularly for somebody

12   who, through their normal drug trafficking business, feel the

13   need to be armed as Mr. Mills is armed.

14    We do believe that being on the bond was not enough to deter

15   Mr. Mills from his criminal activity as he's clearly committing

16   these actions while on bond in that case.  There is no order

17   that would -- this Court could put forward given that he has

18   already violated the previous orders of the Jefferson District

19   Court by continuing these criminal activities.

20    And I don't believe that unlawful activity would be

21   something Mr. Eggert would contest, but he is continuing this

22   pattern, and it is extremely dangerous.  And based on United

23   States Probation, the presumption, the nature and

24   (indiscernible) of these offenses, we do not believe that there

25   are any conditions that the Court could impose at this time that

would prevent Mr. Mills from being a danger to the community or others.

THE COURT:  Mr. Eggert, I'll let you have the last word --

MR. EGGERT:  Thank you.

THE COURT:  -- about presumption.

MR. EGGERT:  Judge, this argument about, essentially, a great of horribles, and I've got to say I would take exception to the way he has denigrated the family.

The mother, Chachika Coleman, is a caretaker for veterans and as -- and has not -- has no record.  She is 52, I think, has no record.  The sister, Taiaka, is a traveling phlebotomist, and she has no record.  Amber Miller has no record.  All right.

And yeah, they've got a case where they found drugs in a shed, I guess they'll try to tie it to the defendant and -- and these guns, but that's why they're getting the benefit of the presumption.  I mean, really.

They're all here today.  They hardly appear to be threatening.  There's no evidence the CI has ever gotten any threat.  There's no evidence that the CI was ever -- assuming he dealt with the defendant, was ever afraid of the defendant.

They've taken everything generic to a normal drug case and say -- and somehow blown them up into a danger, and there just isn't any evidence of that.  There's no evidence he's any danger at all.

1    I understand drugs, and then -- and they get the benefit of

2  the presumption because of the charge, but they keep talking

3  about, "We're worried about the CI, we're worried about this,

4  we're worried about that."

5    I mean, he wouldn't even be living with the family anyway if

6  there is a concern.  He'd be living with Amber.  She doesn't

7  live with the family, and she lives with a completely different

8  address.  So there aren't -- that's where he should live.

9    If they want to say he can't see his family, if they want to

10 say he can't associate with his family, if they want to say he

11 can't visit his family, we would abide by that.  He would stay

12 at his house with his partner, Amber Miller.

13    THE COURT:  All right.  Thank you.  Okay.  I want to

14 take some time to review the arguments and the information

15 before the Court.

16    Mr. Eggert, the exhibit that you --

17    MR. EGGERT:  Oh.  Judge, thank you very much.  Hold on

18 here, I should have it somewhere.  And if I could introduce it

19 into evidence, Judge, and I apologize, as Exhibit 1.

20    THE COURT:  All right.  No objection?

21    MR. SHANNON:  No objection.

22    (Defendant Exhibit 1 admitted in evidence.)

23    THE COURT:  All right.  And then --

24    MR. SHANNON:  Yes.  We'll move to admit.

25    THE COURT:  All right.  Any objection, Mr. Eggert?

1          MR. EGGERT:  None.

2          (Government Exhibits 1 through 11 admitted in

3    evidence.)

4          THE COURT:  All right.  All right.  We'll take a --

5    we'll take a 15-minute recess.

6       (Recess from 1:49 p.m. until 2:23 p.m.)

7          THE COURT:  Thank you-all for your patience.

8          COURT SECURITY OFFICER:  Please be seated.

9          THE COURT:  All right.  The Court is presented with a

10   presumption in favor of detention in this case.  That

11   presumption arises as a result of the nature of the federal

12   judge charge -- drug charges Mr. Mills now faces, which include

13   11 counts of drug trafficking and possessing a firearm in

14   furtherance of drug trafficking.

15       These charges carry substantial penalties, including several

16   of the charges carrying not less than 10 years' incarceration if

17   Mr. Mills is found guilty.

18       To overcome the presumption, Mr. Mills must present and

19   demonstrate that there are conditions which would overcome the

20   presumption that exists that he should be detained pending

21   trial, largely due to the seriousness and dangerousness of the

22   crimes charged.

23       Here Mr. Mills has argued that due to his criminal history,

24   which does not contain any felony convictions, and his personal

25   characteristics, namely his longtime residency in Louisville,

1    close family ties, and his ownership of a business, mitigate

2    against danger, and that there are conditions which could be

3    placed upon him.

4        The presumption of detention, however, remains, and the

5    United States has demonstrated through clear and convincing

6    evidence that Mr. Mills is a danger to the community if

7    released, and I do not find any conditions suitable to impose.

8        It is largely the nature of the charges which are set forth

9    in the 11-count indictment together with the proffer by the

10   United States of the not one but at least three guns found in

11   Mr. Mills' possession along with several controlled buys which

12   form the basis of the 11-count indictment and that are most

13   persuasive here.

14       After considering the factors in 3142(g) along with the

15   arguments, proffers, and submissions today, the Court is not

16   persuaded that there are conditions which would mitigate the

17   risk of danger given the charges and the possession of guns

18   coupled with drugs and controlled buys in which Mr. Mills

19   participated.

20       For these reasons, I find that Mr. Mills will remain in the

21   custody of the US Marshals pending further proceedings.

22       Do we have a date for further proceedings?

23           DEPUTY CLERK:  Yes, Judge.  There is a trial date of

24   December 30th at 9:30.

25           THE COURT:  If counsel would make a note of that trial

1  date.  Is there anything more on behalf of the United States?

2          MR. SHANNON:  No, Your Honor.

3          THE COURT:  Anything more on behalf of Mr. Mills?

4          MR. EGGERT:  No, Your Honor.

5          THE COURT:  All right.  Thank you-all.

6          (Proceedings concluded at 2:26 p.m.)

7                    C E R T I F I C A T E

8      I am an official court reporter for the U.S. District Court

9  for the Western District of Kentucky and certify that the

10  foregoing is a true and correct transcript, to the best of my

11  ability, of the above pages, of the digital audio recording

12  provided to me by the Court of the proceedings taken on the date

13  and time previously stated in the above matter;

14

       s/ Rebecca S. Boyd          December 26, 2024
15  Official Court Reporter          Date

16

17

18

19

20

21

22

23

24

25